## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

AMINA O. ABDI,

      PLAINTIFF,

    v.                      **CASE NO. C2-06-971**
                                    **JUDGE EDMUND A. SARGUS, JR.**
                                    **MAGISTRATE JUDGE TERENCE P. KEMP**

JAMES KARNES,

      DEFENDANT.

### OPINION AND ORDER

This matter is before the Court for consideration of the Defendant's Motion for Partial Summary Judgment. (Doc. #35). For the reasons that follow, the Motion is denied.

### I.

### SUMMARY

The Sheriff of Franklin County has asked this Court to find that he is entitled to summary judgment, claiming that the record in this matter contains no genuine issue of material fact. As discussed below, this Court must review the evidence in this case in a light favorable to the Plaintiff to determine whether the Defendant is entitled to summary judgment, also meaning the Plaintiff is not entitled to a trial. The following analysis reviews the record in this case from the standpoint of evidence submitted by the Plaintiff. This Court is not to weigh conflicting evidence at this stage; only at a trial may such conflicts be resolved.[1]

---

[1] The parties have both waived trial by jury. Nonetheless, conflicting evidence may only be resolved after a trial, and not in the course of a summary judgment proceeding.

This case involves an encounter between deputies of the Franklin County Sheriff's Office and Nasir Abdi. The deputies were acting upon a civil arrest warrant issued by the Franklin County Probate Court, which had determined that Abdi, who suffered from schizophrenia, was a danger to himself and the community.

As described in more detail below, four deputies approached Abdi during an incident which lasted approximately one minute. Abdi was uncooperative and displayed a knife. After Abdi refused to comply with a command of a deputy, another deputy maced him and made physical contact. Abdi swung a knife, resulting in another deputy opening fire and fatally shooting Abdi.

The lawsuit filed by Abdi's estate does not name any of the deputies as defendants. The estate claims that the Sheriff's Office failed to adequately train its deputies as to the manner in which to deal with the mentally ill.

As explained in the pages that follow, the law permits officers to use reasonable, even deadly, force to protect the safety of the community and the officers themselves. The question in this case is not whether the deputies were justified in using deadly force to protect themselves, but whether proper training in approaching and subduing a mentally ill person would have likely prevented the need for deadly force.

The sole basis for the officers to arrest Abdi was the arrest warrant issued by the Probate Court. The order required the Sheriff's Office to use a crisis intervention team, if appropriate. Crisis intervention teams are staffed with officers specially trained to deal with the mentally ill. Such training directs officers first to assemble often critically important information from family members and health care providers before encountering the person. Upon contact

2

with the mentally ill individual, only one officer is trained to speak with the person and any other officers look for this officer to lead the team. Officers on crisis intervention teams are trained to speak softly and keep a distance from the person. The officers are trained to expect verbal outbursts which frequently subside in a short period of time.

Two of the deputies involved in this case worked in a special unit which executed arrest warrants. Neither had any special training on the use of force involving the mentally ill. One deputy had no training at all regarding the mentally ill. The other had only several hours of general instruction in the basic police training program which he completed eighteen years before Abdi's death. In the year Abdi was killed, this unit executed 299 warrants from the Probate Court involving mentally ill individuals who were determined dangerous to themselves or others.

The Sheriff's Office was a participant in the Franklin County Court of Common Pleas Mental Health Task Force, which recommended crisis intervention teams and the training for officers and deputies who confronted the mentally ill. By 2005, the Columbus Division of Police, which operates within Franklin County, had created and trained such specialized units and such training was available to the Sheriff's office at no cost. The Sheriff and key supervisors attended seminars which advocated such training.

The law has long recognized that police departments and sheriff's offices must provide adequate training to officers and deputies so as to prevent otherwise likely violations of the Constitution. A failure to train deputies in the use of force against the mentally ill may cause the use of excessive force, in violation of the Fourth Amendment to the Constitution. The need for such training depends in large part on the specific duties of a particular deputy. In this case, two of the deputies were primarily assigned to serve warrants for arrest, many involving the

3

mentally ill. Because of their job function, the need for such training was much greater than that of other deputies.

As held below, the Plaintiff has presented sufficient evidence to be entitled to a trial.

## II.

Plaintiff, Amina O. Abdi ["Plaintiff"], brings this action individually and in her capacity as representative of the estate of Nasir A. Abdi, her son. The Defendant in this action is Franklin County Sheriff, James Karnes. Plaintiff's Complaint includes claims for alleged violations of the Fourth Amendment to the United States Constitution, the Americans with Disabilities Act,[2] the Fourth Amendment to the Ohio Constitution, and wrongful death under Ohio Revised Code § 2125.01, *et seq.* This action was originally filed in the Court of Common Pleas for Franklin County, Ohio and was removed to this Court on the basis of federal question jurisdiction, 28 U.S.C. §§ 1331, 1441.

By way of background, Nasir Abdi was born in Somalia on June 26, 1982. (*Complaint* at ¶ 4). Abdi immigrated to the United States in 1999 to join his mother. (*Id.*). While attending high school in Columbus, Ohio, Abdi was diagnosed with schizophrenia. Abdi was prescribed medication and received care through Netcare, a mental health treatment network with outpatient and inpatient facilities. (*Id.* at ¶ 5). At the time of the events giving rise to this action, Abdi resided with his brother and uncle in an apartment in Columbus, Ohio. (*Id.* at ¶ 6).

On December 28, 2005, a representative of Netcare filed an Affidavit of Mental Illness with the Franklin County Probate Court. The affidavit identified two grounds for the

---

[2] The Court will address Defendant's Motion, as it relates to Plaintiff's claims under the Americans with Disabilities Act, by a separate Opinion and Order.

4

alleged illness; specifically, that Abdi:

> Represents a substantial risk of physical harm to others as
> manifested by evidence of recent homicidal or other violent
> behavior, evidence of recent threats that place another in
> reasonable fear of violent behavior and serious physical harm, or
> other evidence of present dangerousness; [and]

> Would benefit from treatment in a hospital for his mental illness
> and is in need of such treatment as manifested by evidence of
> behavior that creates a grave and imminent risk to substantial rights
> of others or himself.

(Deposition Exhibit 6).

> The affidavit further states:

> Recent TVBH [Twin Valley Behavioral Health] discharge with
> diagnosis schizophrenia, paranoia type. Refusing medications. Per
> family report, individual threatened a waitress at restaurant 2 nights
> ago, Col[umbus] police responded but no charges filed.
> Purportedly stole relative's vehicle and returned it yesterday.
> Roommate reports he is threatening roommate with knife. History
> of assault to case manager and physician. Informed probate
> prescreener "they tell me to" referring to auditory hall [*sic*].
> Observed today as agitated, refusing to discuss mental health
> treatment. Threatened cousin yesterday.

(*Id.*).

An accompanying document, entitled "Case History of Mental Illness," states that

Abdi has a "[h]istory of mental health treatment, auditory hallucinations, command type,

paranoia, carries a knife and makes threats to harm." (Deposition Exhibit 11). It is further noted

that Abdi had a recent use of alcohol, the extent of which was unknown. Abdi is described in the

history as "violent," "destructive," and "homicidal." (*Id.*). The history also notes that Abdi

carries a knife, has assaulted a case manager and Netcare physician, and made recent threats with

the knife. (*Id.*). Abdi is described as not complying with his physician's instructions for

5

treatment. (*Id.*).

On December 28, 2005, Franklin County Probate Judge Lawrence A. Belskis

issued an Order of Detention for Abdi pursuant to R.C. § 5122.11. The order stated:

> You are, therefore, commanded to take in custody the said person
> forthwith and transport him to the Franklin County ADAMH
> Board with placement at NetCare and/or TVBH-CC and/or any
> other appropriate facility, then and there to abide the order of this
> Court in the premises.
>
> HEREIN FAIL NOT, and of this writ make legal service and due
> return not later than the first business day after service is had. In
> executing this order of detention, the person to whom this order is
> directed shall use every reasonable and appropriate effort to take
> this person into custody in the least conspicuous manner possible,
> using persuasion and a crisis intervention team, if necessary.
> Having failed to accomplish custody thereby, forcible entry is
> authorized by utilizing the least destructive method and custody
> may thereupon be had by the use of the least force necessary to
> accomplish the task.

(Deposition Exhibit 5) (emphasis added.)

Franklin County Sheriff's Deputies Everett Hall, Jr. and Eugene Anderson were

assigned to the Warrants and Extraditions Unit of the Sheriff's office. Their duties in this

capacity included serving orders of the Probate Court. It is undisputed that the Franklin County

Sheriff's Office executed 299 such orders in 2005. The orders issued by the Probate Court are

based upon evidence that the party is a danger to himself or others; no allegation or proof of

criminal conduct is involved in the application for such orders.

On December 28, 2006, Deputies Hall and Anderson received the assignment to

execute the warrant for Abdi. Deputy Hall testified on deposition that, after reading through the

paperwork and learning that Abdi was known to carry a knife, he called for backup assistance

6

from two uniformed deputies. (*Deposition of Everett Hall, Jr.* [hereinafter "*Hall Depo.*"] at 84).

Hall requested that the two deputies, in marked cruisers, meet him and Deputy Anderson at the

Donatos restaurant at the corner of Agler Road and Cassady Avenue in Columbus, Ohio to

review the paperwork and discuss the assignment. (*Id.*).

Deputies Michael Wiley and Jason Evans met Hall and Anderson. The four

deputies reviewed the paperwork from the Probate Court and discussed how to approach Abdi.

(*Deposition of Michael Wiley* [hereinafter "*Wiley Depo.*"] at 54-65; *Deposition of Eugene*

*Anderson* [hereinafter "*Anderson Depo.*" at 103). The deputies decided to obtain a key to Abdi's

apartment from the apartment complex manager. Upon asking for the key, Deputy Hall was

informed that Abdi was outside. Deputy Hall observed Abdi outside leaning against a fence,

smoking a cigarette. (*Hall Depo.* at 132). Hall and Anderson exited the car and asked the man if

he was Nasir Abdi. (*Id.* at 133-34). Hall and Anderson did not have their guns drawn. (*Id.*).

Abdi gave an affirmative response to the deputies' question. (*Id.* at 134). Hall told Abdi that he

was from the Sheriff's Department and they were there to take Abdi to see a doctor. Hall

explained that he had a court order to take Abdi to Netcare. (*Id.* at 135). According to Deputy

Hall, Abdi said "fuck you" and pulled a knife from his pocket. (*Id.*). Deputy Hall was

approximately 17 feet from Abdi and Anderson was approximately 10 to 12 feet from Abdi. (*Id.*

at 136). The deputies told Abdi to drop the knife and they pulled their weapons.[3] (*Id.* at 139).

Abdi did not drop the knife. Deputies Wiley and Evans, whose vehicles were parked behind Hall

and Anderson, also drew their weapons. (*Id.*). Hall testified that when Abdi pulled the knife, at

12:53:58, he radioed a "Signal 99," which indicated an emergency situation requiring exclusive

---

[3]Hall testified that he yelled "drop the knife." (*Hall Depo.* at 143).

use of radio channels. (*Hall Depo.* at 140). At 12:54:06, Hall radioed that Abdi had a knife. (*Id.* at 140-41).

Deputy Evans testified on deposition that as soon has he saw Hall and Anderson with their weapons drawn, he exited his vehicle and drew his weapon. (*Evans Depo.* at 146-47). He saw Abdi with the knife. (*Id.*). According to Evans, Hall and Anderson were 15 to 20 feet away from Abdi. (*Id.* at 152). Evans testified:

> Mr. Abdi raised the knife over his right shoulder with his right hand and began waiving it, showing it to us, pacing back and forth, making sure we all saw it.

(*Id.* at 155). As to Abdi's demeanor, Evans testified that he was "angry" and "upset" but was not screaming or yelling. (*Id.*). Evans testified that he did not see any other persons present outside the apartment complex. (*Id.* at 158). Evans did not recall Abdi ever bringing the knife down below his head. Abdi continued pacing and waving the knife in one hand, while holding a cigarette in the other hand. (*Id.* at 161). All four deputies at one time during the short encounter yelled at Abdi to drop the knife.

Deputy Wiley testified on deposition that he observed Hall and Anderson with their weapons drawn and also drew his weapon. (*Wiley Depo.* at 92-96). Wiley reached for his mace, but it dropped to the ground and rolled underneath the car. (*Id.* at 100). Wiley then reached for the can of mace on Deputy Evans' belt. (*Id.* at 102). Wiley returned to his position, approximately 10 to 12 feet from Abdi. Wiley dispersed a one to three second burst of mace at Abdi, hitting Abdi in the face to the cheek. (*Id.* at 105). In response, Abdi turned his back and bent over. Wiley then approached Abdi to attempt to take him into custody. (*Id.* at 108). Abdi turned and swung the knife at Wiley, who blocked the attack with crossed arms. Wiley stumbled

8

backward. (*Id.* at 108-112). Evans testified as follows:

> [O]nce I saw Deputy Wiley was falling back or slowing down, the
> separation was made between him and Mr. Abdi - as soon as I saw
> . . . Abdi lunge at Deputy Wiley again - Deputy Wiley didn't have
> any mace or his weapon at that point - I felt that his life was in
> danger, so I did my job and fired one round in Mr. Abdi's direction
> to stop his aggressions towards Deputy Wiley.

(*Evans Depo.* at 188). Evans further testified that when the shot hit Abdi, "it instantly stopped

his forward progress, and he fell onto his - his kind of front right side." (*Id.* at 189). The

Deputies rolled Abdi over, handcuffed him, an started to administer chest compressions. (*Id.* at

194-95). The entire incident, from the initial Signal 99 call to the shot fired transpired in less

than one minute, from approximately 12:53:58 to 12:54:32 p.m. Abdi was taken to Grant

Medical Center and died later that day.

All four deputies have given deposition testimony regarding the amount of

training they have received as to dealing with persons suffering from serious mental illness. As

to the two deputies who regularly executed civil commitment orders from the Probate Court, Hall

had completed basic training from the Ohio Peace Officer's Training Academy ("OPOTA") in

1987, while Anderson had received comparable training in Pennsylvania in 1979. To serve as a

law enforcement officer in Ohio, a person must complete the basic OPOTA training, on an

OPOTA certified course. Anderson testified that he did not receive any training as to the

handling of persons with mental illness. In 1987, Hall had limited training of six hours as to

issues involving both alcohol abuse and mental illness. Neither received subsequent training

regarding mental illness in their general capacities as deputies or in their specialized role as

warrant executors on the Fugitive Squad.

9

Wiley and Evans both completed the basic OPOTA training program, which, according to Evans, in 2002 included three hours of instruction regarding mental illness. Neither recalled any special procedures to be followed with the mentally ill, other than to bring down the level of stress of the target, if appropriate.

Prior to the death of Nasir Abdi, the Sheriff and several high ranking deputies attended seminars and meetings in which the need for special training in dealing with the mentally ill was discussed. These included meetings attended by the Sheriff and sponsored by the Buckeye Sheriff's Association, the primary organization of the various Sheriffs throughout Ohio. During one such meeting, a presentation was made by Lieutenant Michael Woody of the Akron Police Department. Woody described the insufficiency of basic police training in dealing with the mentally ill and noted the need for specially trained crisis intervention teams. These teams are given additional training to deal with unique responses to the mentally ill, such as the need to lower tensions, the benefit of patience, the lowering of voices, the keeping of distance, and the presence of non-lethal weaponry.

The same protocol was advocated by Lieutenant Woody at a meeting of a Franklin County Mental Health Court Task Force which occurred on June 21, 2002, and was attended by four high ranking supervisors from the Sheriff's office. Woody again described the need for a crisis intervention team and the fact that training could be provided at no direct cost. The Task Force, which included several judges, law enforcement officials, the Sheriff's Department personnel and mental health workers, noted the need for such specialized training to prevent injuries to officers and the application of unnecessary force.

10

In 2002, the Columbus Division of Police created and trained a crisis intervention unit. Almost all of the City of Columbus is within Franklin County. While city police officers often deal with the mentally ill in the course of law enforcement duties, under Ohio law, the Sheriff's Department is authorized to execute arrest warrants issued by the Probate Court. According to Lieutenant Woody, deputies from the Sheriff's Office could be trained as members of a crisis intervention team at no cost.

Other high level supervisors in the Sheriff's Office attended the 2004 FBI National Academy which included a three and one-half hour course on the need for special training to avoid the use of unnecessary lethal force in dealing with the mentally ill. Other managers received the same warnings in the FBI's Law Enforcement Bulletin. Finally, other supervisory personnel received and read the Criminal Justice/Mental Health Consensus Project Report, a prominent publication which also stressed the need for specialized training in encounters with the mentally ill.

Several years prior to Abdi's death, a deputy sheriff shot and killed a mentally ill patient who was wielding a machete. Anderson testified that he had frequently engaged in physical confrontations with mentally ill individuals in his work on the Fugitive Squad. Finally, the Sheriff testified that earlier in his law enforcement career, he had suffered injuries and used force in dealing with the mentally ill.

The foregoing facts are undisputed. The Defendant moves for summary judgment on the federal claims asserted in the Complaint. The Court now considers the merits of this Motion.

11

**III.**

The procedure for considering whether summary judgment is appropriate, is found

in Fed. R. Civ. P. 56(c); this section provides, in relevant part:

> The judgment sought shall be rendered if the pleadings, the
> discovery and disclosure materials on file, and any affidavits show
> that there is no genuine issue as to any material fact and that the
> movant is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v.*

*Kress & Co.*, 398 U.S. 144, 158-59 (1970). Summary judgment will not lie if the dispute about a

material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is appropriate however, if the opposing party fails to make a showing

sufficient to establish the existence of an element essential to that party's case and on which that

party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);

*see also, Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

The United States Court of Appeals for the Sixth Circuit has recognized that

*Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment

practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886

F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identifies a number of important principles

in new era summary judgment practice. For example, complex cases and cases involving state of

mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party

"cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed

12

fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce more than a mere scintilla of evidence in order to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

## IV.

Defendant Sheriff James Karnes moves for summary judgment on Plaintiff's Fourth Amendment claim pursuant to 42 U.S.C. § 1983. According to the Plaintiff, the Defendant failed to adequately train his Deputies regarding encounters with mentally ill individuals. Plaintiff contends that this alleged lack of training amounts to deliberate indifference for purposes of a Fourth Amendment claim.

The inadequacy of police training may serve as a basis for § 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989). The Supreme Court has identified two situations in which deliberate indifference in the failure to train police officers may be found. The first instance is when a municipality fails to react to repeated complaints of constitutional violations by its officers. *Id.* at 390, n.11. The second instance is

13

when there is a lack of adequate training in light of forseeable consequences that could result from such a lack of instruction. *Id.* at 390.

In *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992), the Sixth Circuit applied this standard and further defined the proof necessary to show that alleged inadequate training is the cause of a constitutional violation. Specifically, the court held that the Plaintiff must show: (1) that the training program was inadequate for the tasks the officers must perform; (2) that the inadequacy was the result of the city's deliberate indifference; and (3) that the inadequacy was "closely related to" or "actually caused the . . . injury." *Id.* at 1046 (citations omitted).

In *Russo*, officers from the City of Cincinnati were dispatched to return a diagnosed paranoid schizophrenic man to a treatment center. The officers encountered the man at his apartment. When he opened the door, the man held a knife in each hand with the blades pointed at the officers. Two officers drew their weapons and the man shut the apartment door but could be heard making threats. 953 F.2d at 1040. The man then opened the door holding the knives in each hand. One officer fired two Taser darts at the man. The man overcame the effect and rushed toward one of the officers.[4] The other two officers immediately fired their revolvers "several times" causing the man to fall to the ground. The man remained conscious and allegedly stood up with one knife in hand. The officers ordered him to drop the knife. He did not and shots were fired again, causing the man to fall back down. The man later died at a hospital after being shot a total of twenty-two times. *Id.* at 1041.

---

[4]In *Russo,* the record revealed a dispute of fact as to this allegation.

14

The deceased's family sued the City of Cincinnati and the police officers for alleged constitutional violations. With respect to the claim that the City failed to adequately train its officers in the proper exercise of force when dealing with mentally ill persons, the Sixth Circuit held that plaintiffs came forward with sufficient evidence to show that the training offered by the City was constitutionally inadequate; that the inadequacy resulted from the City's deliberate indifference to the rights of mentally ill persons; and that the inadequate training may have directly resulted in the death of the man in question. *Id.* at 1047. In reaching this decision, the court cited the City's investigational report, which noted that there were no procedures or methods for interviewing mentally ill individuals or for recognizing the mentally ill. The court also cited the plaintiff's proffered expert testimony which reviewed the officers' training. The expert concluded that, although the officers had some nominal training, "it was not of such a nature as would assure a proper understanding and appropriate response to a situation of this sort." *Id.* The court held that, in the context of a failure to train claim, "expert testimony may prove the sole avenue to plaintiffs to call into question the adequacy of a municipality's training procedures." *Id.* The court further held that, the fact that the City of Cincinnati offered a seven hour course entitled "Disturbed-Distressed Persons" was not, by itself, enough to shield the city from liability. *Id.* Plaintiffs argued that the content of this training was inadequate and the city offered no evidence to refute this assertion. Thus, the court found a genuine issue of material fact as to whether the training used by the City rose to a level of deliberate indifference.

The decision in *Russo*, which is binding on this Court, established that failure to adequately train police officers with respect to the use of force on mentally disturbed persons resulting from deliberate indifference to the rights of such persons may serve as a basis for a

15

claim under § 1983. Three opinions were issued in *Russo*, however. While Judge Suhrheinrich dissented, Judge Wellford only concurred as to the issues involving failure to train. Even though Judge Wellford found that a municipality could be liable for failure to train its officers in using force on the mentally ill, his concurring opinion raises several issues pertinent to this case.

The first involves proof of deliberate indifference on the part of the police department. Judge Jones, who authored the majority opinion, considered the expert opinions offered by Dr. George L. Kirkham,[5] and concluded that such testimony is entitled to substantial weight in a summary judgment context. Judge Wellford, however, disagreed and concluded that "plaintiffs must make a stronger showing" than the testimony of an expert witness. *Id.* at 1049 (Wellford, J., concurring). Instead, Judge Wellford relied upon the fact that, because the Cincinnati Office of Municipal Investigation concluded that training was inadequate, summary judgment should not be granted to the City.

Since the decision in *Russo*, a number of published and unpublished opinions have been issued by the Sixth Circuit regarding claims of failure to train in the use of force against the mentally ill. The first was *Pirsein v. Village of Berrien Springs*, 1992 WL 348944, 980 F.2d 731 (6th Cir. 1992) (unpublished). In this case, one patrol officer was called to a scene involving a mentally ill person walking on the middle of two lane highway during a downpour. Without warning, the person seized a tire iron, smashed the windows of the cruiser and struck at the officer. The officer fatally shot the person. The court held that use of force was reasonable and that in any event a lack of training could not have caused the decedent's death.

---

[5]Dr. Kirkham is also an expert witness for the Plaintiff in this case.

16

In *Trent v. Hawkins County*, 1997 WL 35574, 106 F.3d 402 (6th Cir. 1997) (unpublished), the plaintiff was shot in the leg after shooting a gun in the direction of the responding officers. The Court found that the testimony of the same Dr. Kirkham was insufficient to defeat the defendant's motion for summary judgment. Emphasizing the concurring opinion of Judge Wellford in *Russo*, the Court concluded that Dr. Kirkham's opinion alone could not establish that the county was deliberately indifferent to the need for training. The plaintiff in *Trent* could not point to an official investigative report criticizing the lack of training, which, according to Judge Wellford, provided the basis for the claim in *Russo*.

In *Gaddis v. Redford Township*, 364 F.3d 763 (6th Cir. 2004), a police officer saw a person driving in an erratic manner. Suspecting drunk driving, the officer stopped the vehicle and ordered Gaddis out of the car. The driver exited and then pulled out what the officer, and back up law enforcement, believed to be a knife. A stand off ensued. Approximately two to three minutes later, an officer maced Gaddis, who then appeared to try to stab the officer. The other officers opened fire, injuring Gaddis. In the ensuing lawsuit, Gaddis alleged that the municipalities employing the officers failed to properly train them as to the use of force on mentally ill persons.

The Court of Appeals observed that the officers had "only fragmentary evidence" that Gaddis was mentally disturbed. *Id.* at 775. In the view of the Court, this fact distinguished the case from *Russo*, in which the officers knew Russo was mentally ill. Gaddis' conduct was more consistent with the officer's suspicion that he was driving while intoxicated. The Court also considered the opinion testimony of plaintiff's expert that training to use nonconfrontational tactics would have obviated the need for such force. The Court noted that *Russo* "drew partially

17

upon such testimony in concluding that the inadequate training procedures of the Cincinnati Police Department may have contributed to the shooting death of plaintiff's suicidal, mentally ill decedent." *Id.* at 775. The Court concluded that the opinion testimony was insufficient to defeat summary judgment, because the officers had no direct evidence that Gaddis was mentally ill.

In *Estate of Terry Sowards v. City of Trenton*, 2005 WL 434577, 125 Fed. Appx. 31 (6th Cir. 2005) (unpublished), the decedent allegedly threatened another person with a knife. An officer responded and located Sowards at his apartment. Soward, who was mentally ill, refused to come out and barricaded his door. Other officers arrived and decided to force entry. Sowards pointed a gun at the officers who then shot him to death.[6] The Court concluded that Soward's conduct, and not the failure to train, was the proximate cause of his death. By pointing the gun at the officers, Soward's conduct superceded any failure to train as the proximate cause.

Finally, in *Untalan v. City of Lorain,* 430 F.3d 212 (6th Cir. 2005), the Court applied the holdings in *Russo* to another case involving the fatal shooting of a mentally ill person. Untalan had attacked his mother with a butcher knife. Officers responded and talked to Untalan, who had barricaded himself in the kitchen, for over forty-five minutes. Untalan suddenly lunged at an officer and stabbed him in the side with a large butcher knife. Another officer opened fire, killing Untalan. The Court concluded that deadly force was justified under the circumstances.

Taken together, these cases provide a more focused and narrow interpretation of the decision in *Russo*. Several involved a firearm discharged or aimed at an officer. Others, *Pirsein, Gaddis* and *Untalan*, involved an attack on a police officer with either a knife or a tire

---

[6]The Court also questioned whether the warrantless entry was lawful, but concluded that Soward's pointing of the gun, and not the entry, caused his death.

18

iron. While several of these opinions include expert testimony on the failure to train issue, none of these opinions includes testimony regarding the extent of knowledge of a police chief or sheriff as to use of force in the special circumstances that arise regarding the mentally ill.

In addition, all of the cases following *Russo* involved officers or deputies responding to emergency calls. These cases did not involve probate court orders directing the seizure of a mentally ill person. The cases did not involve officers who served hundreds of such probate court orders per year and who were directed by a probate judge to use a crisis intervention team, if necessary. In this context, the Court reviews the elements of a claim for failure to train deputies regarding the use of force in cases with the mentally ill.

## A.    Fourth Amendment Claim

Plaintiff must first establish that a constitutional violation occurred before she may claim a failure to train. If the force used by the deputies was reasonable, no claim can be made for failure to train, because any such failure did not result in a constitutional violation. Abdi asserts that the force used by the deputies was excessive and unjustified. The Fourth Amendment, as incorporated upon the states and their subdivisions by the Fourteenth Amendment, prohibits the use of excessive force.

> As held in *Gaddis*:
>
> The sole constitutional standard for evaluating excessive force claims is the Fourth Amendment's criterion of reasonableness. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Courts must apply an objective standard, looking to "the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect pose [d] an immediate threat to the safety of the officers or others, and [3] whether he was actively resisting arrest or attempting to evade arrest by flight." *Russo v. City of Cincinnati*,

953 F.2d 1036, 1044 (6th Cir.1992) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865) (brackets added).

364 F.3d at 772.

In addition, the Supreme Court has cautioned a deputy's conduct must be evaluated from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Essentially, the determination of whether excessive force was used turns on the breadth or narrowness of the facts used in the analysis. From the narrow perspective, the deputies were authorized to arrest Abdi, who refused to comply with their directives. The deputies were authorized to use force to secure the arrest. When they did by using mace, Abdi lashed out with a knife in the direction of a deputy. Another deputy believed that lethal force was necessary to protect the life of another. All of this occurred in approximately one minute.

From a broader perspective, the Sheriff's Office provided no training regarding the mentally ill to any of the four deputies, two of whom regularly arrested such persons per orders of the Probate Court. In the year Abdi was shot to death, the unit to which these deputies were assigned arrested 299 persons deemed both mentally ill and dangerous by the Probate Court. The Probate Court itself ordered the Sheriff's Office to use a crisis intervention team, if necessary. Such teams are formed after training. The special training, according to Dr. Kirkham, involves the use of different tactics in dealing with the mentally ill, including the gathering of specific information from family members and mental health providers, the advance planning as to which deputy alone would speak to the arrestee, the expectation of verbal threats, the need to speak in a

20

soft voice, and the probability that many violent verbal outbursts quickly subside. These strategies were not used by the deputies, notwithstanding the Order of the Probate Court.

Defendant urges this Court to rely upon *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996) and narrow the focus of the analysis to only the time involving the face-to-face encounter. In *Dickerson*, the decedent was shot to death by officers who were instructed by a dispatcher that shots had been fired. *Id.* at 1154. The Court distinguished the claim for unlawful, unannounced entry from that of excessive force. The Court of Appeals noted that the sequence of the events was correctly described as the critical factor. If the entry and the shooting were quite close in time, the analysis of the excessive force claim must include consideration of the unlawful entry. If the two were separated by a sufficient time, the causation connection of the shooting to the entry disappears.

This Court does not read *Dickerson* to limit the analysis in this case. A failure to train claim, by definition, necessarily involves antecedent events, such as a need for training based on prior knowledge and a showing of deliberate indifference, all of which must have occurred before the event. *Dickerson* addresses only an excessive use of force and not a failure to train.

In addition to the expert's opinion, the record also reveals that since 2002, the Sheriff's Office was actively involved in a Mental Health Task Force convened by the Franklin County Common Pleas Court. This task force encouraged the creation of crisis intervention teams specially trained to limit the need for use of force against the mentally ill. The record also contains some evidence that the Sheriff and top administrators attended meetings and received

21

well-regarded law enforcement publications describing the need for such crisis intervention teams and specialized training.

To resolve the question of whether a narrow or broader analysis is appropriate involves the weighing of testimony and evidence. The Court is mindful that the Motion under consideration seeks summary judgment, in lieu of a trial. The Court is not convinced that, in the absence of trial, the underlying claim of excessive force necessary to sustain a claim of failure to train is amendable to summary judgment. The Plaintiff has produced sufficient evidence to at least establish a genuine issue of material fact.

**B.    Adequacy of the Training**

In analyzing whether the training actually received by the deputies was adequate, the Court first notes that Deputies Hall and Anderson were assigned full time to the Warrants and Extraditions Unit of the Sheriff's Office. As noted, in the year Abdi was killed, this unit executed 299 arrest warrants for the Probate Court, all of which involved some type of mental illness commitment orders for persons posing a danger to themselves or the community, and who required an arrest. The level of appropriate training has a relationship to the likelihood that a deputy would encounter a dangerous mentally ill person. As to Hall and Anderson, encounters with dangerous, mentally ill persons were virtually certain to occur.

Deputy Anderson did not receive any training regarding the use of force and the mentally ill. While attending the OPOTA basic training course to become certified as a law enforcement officer in Ohio in 1987, Deputy Hall received approximately six hours of training in both substance abuse and mental illness. Since 1987, Deputy Hall received no additional training as to dealing with the mentally ill. Neither Anderson nor Hall received additional training upon

22

assignment to the Warrants Unit. None of the four deputies were trained as part of a crisis intervention team.

Deputies Wiley and Evans also received the OPOTA basic training. At the time Evans completed the training in 2002, the curriculum included a three hour presentation on dealing with the mentally ill. Neither received training after completion of the OPOTA program. From the record, it appears that Wiley and Evans did not regularly execute arrest warrants as part of their normal responsibilities.

As noted in *City of Canton v. Harris*, 489 U.S. 378, 390 (1989), the issue is whether the training program was inadequate in light of the tasks the officers performed. In this case, Deputies Anderson and Hall were tasked on a frequent basis with executing arrests of mentally ill individuals. Given the directive from the Probate Court that a crisis intervention team be used if necessary, the recommendation of the Mental Health Task Force of the Franklin County Court of Common Pleas for such a trained team, the opinion of the Plaintiff's expert, Dr. Kirkham, and the courses attended and materials received by the Sheriff or high level managers, the Court concludes that summary judgment in favor of the Defendant on this issue must be denied. There is a genuine issue of material fact as to the adequacy of training.

## C.     **Deliberate Indifference**

Plaintiff must also establish that the failure to train the deputies represented "deliberate indifference to the rights of persons with whom [the deputies] come into contact." *City of Canton*, 489 U.S. at 388. There are two methods available by which to make such showing. First, the plaintiff may attempt to show that an agency failed to react to repeated complaints of constitutional violations. *Id.* at 390, n. 11. Second, the plaintiff may attempt that

23

the foreseeable consequences of a failure to train is the violation of a constitutional right.  *Id.* at 390.

The record does not contain any evidence from which to conclude that the Sheriff failed to react to repeated complaints of constitutional violations.  Instead, Plaintiff contends that the record supports her claim that the foreseeable consequences of failing to train the deputies were the deprivation of her son's constitutional rights.  In support of this position, she offers the following:

1.  The Order of the Probate Court directing the use of a specialized crisis intervention team;

2.  The large number of orders for arrests of the mentally ill issued by the Probate Court, totally 299 in 2005;

3.  The expert opinion of Dr. Kirkham;

4.  The recommendation of the Mental Health Task Force of the Franklin County Court of Common Pleas;

5.  A prior shooting death that occurred during the execution of a Probate Court order;

6.  The seminars attended by the Sheriff and management staff recommending special training;

7.  The receipt of well-regarded law enforcement publications recommending specialized training;

8.  The offer of free specialized training made to the Sheriff's office;

9.  The knowledge and experience of the Sheriff as to the use of force in regards to the mentally ill.

24

Defendant disputes much of this evidence and draws sharply different conclusions as to the question of deliberate indifference.

> As the Supreme Court held in *City of Canton*:
>
> > [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Id.* at 390.

The Court concludes that the evidence produced by Plaintiff reveals a genuine issue of material fact which can only be resolved by a trial.

**D.    Causation**

To prevail on a failure to adequately train claim, Plaintiff must also show that the inadequacy was "closely related to" or "actually caused" the injury. *City of Canton*, 489 U.S. at 390. The specific injury must be connected in this manner to the alleged constitutional violation.

> As the Supreme Court held in *City of Canton:*
>
> > Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury. Thus in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs. Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect? Predicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder, particularly since matters of judgment may be involved, and since officers who are well trained are not free from error and perhaps might react very much like the untrained officer in similar circumstances. But judge and jury, doing their respective jobs, will be adequate to the task.

*Id.* at 391 (footnote omitted).

As explained in *Soward*, proof of a constitutional violation does not establish that the deprivation caused injury. 125 Fed. Appx. at 42. The *Soward* decision cited as an example a hypothetical situation in which officers enter a house without a warrant thereby violating the Constitution. The suspect is found in the house, breaks away, shoots one of the officers and is then killed by a second officer. The antecedent unlawful entry was wholly superceded by the intervening conduct of the suspect, thereby breaking any causal link to the original entry. *Id.*

Likewise, in *Soward*, the decedent pointed a gun at the officers, who responded with deadly force. The decedent's conduct broke any causal link connecting his death to any failure to adequately train the officers. Put another way, the plaintiffs could not demonstrate that a properly trained officer would not have also responded with deadly force had the decedent pointed a gun at him or her.

In this Court's view, Plaintiff must show that the deficiency in a city's training actually caused the death of Abdi. *City of Canton* at 391. All of the Sixth Circuit cases following *Russo,* involved an unexpected, potentially lethal attack upon an officer. *Pirsein* involved the use of a tire iron to smash a window on the cruiser in which the officer was sitting. In *Trent*, the suspect shot a gun in the direction of the officers. In *Gaddis*, officers believed that Gaddis was attempting to stab a law enforcement official. In *Untalan*, the decedent suddenly attacked an officer, stabbing him with a large knife before he was killed by another officer.

In all of these cases, the officers had no warning of a sudden, violent attack. While in *Gaddis*, the plaintiff was involved in a dialogue with police, the officers did not have reason to believe he was mentally ill before he suddenly attacked without provocation. Likewise,

26

in *Untalan*, the officers spoke to the decedent for forty-five minutes before he attacked them with a large knife.

The common thread in these cases is that a sudden, unprovoked, unanticipated violent assault by a mentally ill person breaks any casual link between resulting injury or death and a claim of inadequate training. All of these cases involved patrol-type officers or deputies. All were responding to exigent circumstances.

In this case, the deputies routinely arrested mentally ill individuals and had reason to take precaution. Unlike the officers in the cases described, the deputies in this case had time to plan for the encounter with a mentally ill individual. This opportunity to actually use specialized techniques in encountering Abdi was absent in the other cases.

As noted in *City of Canton,* 489 U.S. at 391, the issue of proximate cause is a question of fact and not law. The trier of fact must determine from a review of all the evidence whether the failure to train was "closely related to" or "actually caused the . . . injury." *Russo*, at 2046. At this juncture, the Plaintiff has produced sufficient evidence demonstrating a genuine issue of material fact as to the issue of causation.

**V.**

Based upon the foregoing, the Defendant's Motion for Partial Summary Judgment (Doc. #35) is **DENIED.**

**IT IS SO ORDERED.**

5 - 27 - 2008

**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

27